## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

EBONY KELLEY,

     Plaintiff,

v.                              Case No. 8:23-cv-1162-WFJ-SPF

ALLEGIANT AIR, LLC d/b/a
Allegiant Airlines,

     Defendant.

_____/

## <u>ORDER</u>

Before the Court is Defendant's motion for summary judgment (Dkt. 33), Plaintiff's response (Dkt. 40), and Defendant's reply (Dkt. 42).  After careful consideration of the submissions of the parties, the applicable law, and the entire file, the Court concludes Defendant's motion is due to be granted.

Plaintiff Ebony Kelley, a black African American woman, sues Allegiant Air, LLC ("Allegiant") for racial discrimination and retaliation under 42 U.S.C. § 1981. Dkt. 1.  After a company investigation of a racial complaint made by a white co-worker, Plaintiff was suspended and then terminated.  Plaintiff alleges discrimination because her non-black co-worker was not reprimanded or terminated for similar offending conduct.  She claims Allegiant terminated her in retaliation for informing the general manager of the Pinellas International Airport,

human resources ("HR"), and Allegiant's CEO about past "racial" conduct of the co-worker.  Defendant seeks summary judgment on both counts.

## PERTINENT FACTS

The facts are set forth in the light most favorable to the nonmoving party, Plaintiff.[1]  On February 24, 2021, Plaintiff accepted a position as trainee for a customer service agent with Allegiant at the Pinellas International Airport in Pinellas County, Florida (identified as "PIE").  Dkt. 36-2.  After she successfully passed training, Plaintiff became a part-time customer service agent on April 30, 2021.  Dkt. 36-1 (Dep. of Kelley) at 25.  Because Plaintiff desired to hold a lead or supervisory position in customer service or ground operations, she applied for these jobs as early as June 2021, when openings became available.  Dkt. 36-1 at 29; Dkt. 36-14 at 2.

### *Attendance warning*

On July 12, 2021, however, Plaintiff received a warning for attendance violations.  Dkt. 36-5 (Corrective Counseling Form of 7/7/2021); Dkt. 41 at 2, 3 (Plaintiff's admission of receipt on 7/12/2021).  This "Level 2 Warning" issued

---

[1] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

after she "called off" for her scheduled shift at least six times over two months.[2]
*Id.*  This warning is significant because it generally excludes consideration for a promotion or transfer. [3]  Under Allegiant's policies, an employee is not eligible for a promotion the first six months of employment as well as for twelve months after receiving a Level 2 or higher discipline.  Dkt. 36-3 at 31; Dkt. 36-1 at 34 ("The policy says it will stay on your record for 12 months.").  Nevertheless, these requirements may be waived in "extraordinary or unique situations." [4]  *Id.*

*Offending behavior of another employee*

Undeterred by her warning, Plaintiff applied for the October 2021 posting of an available lead position as a customer service or ground operations agent.  Dkt.

---

[2] Calling off or calling out refers to an employee calling Allegiant to report he or she will not be coming to work (taking unscheduled time off) when he or she has no available sick time.  Dkt. 36-13 at 5.

[3] The Team Member Handbook, or employee handbook, provides in pertinent part:

> Team Member eligibility for promotions and transfers will be based on, but not limited to:
> 1. Ability to meet criteria of the new position as defined in the job description
> 2. Completion of at least six (6) months in the current position
> 3. No disqualifying corrective counseling
>     a.  Disqualifying or corrective counseling is defined as an ongoing Performance Improvement Plan (PIP); performance or conduct infractions at a Corrective Counseling Level 2 or Final; or attendance infractions at a Corrective Counseling Level 2 or Final.
> Corrective counseling is defined as an ongoing performance improvement.
> In extraordinary or unique situations, the eligibility requirements listed may be waived if approved by People Services.

Dkt. 36-3 at 31.  "People Services" means the HR department.  Dkt. 41-3 at 4.

[4] Plaintiff admits that her situation was not unique, but "it could have been [unique] . . . had they approved me."  Dkt. 36-1 at 34.

3

36-1 at 34; Dkt. 36-14 at 3.  Plaintiff believes Allegiant discriminated against her by not hiring her for this position.  Dkt. 36-1 at 34.  It was about this time that she started receiving comments about her hair.  *Id*. at 35 ("I need to perm it. It's nappy. Is it yours?").  She told John Jordan, a black co-worker, about how all the co-workers were touching her hair every day.  *Id*. at 14.  The only person who Plaintiff can name as someone who touched her hair was "Stacey"—a white co-worker.  *Id*. at 12.  As she touched Plaintiff's hair, Stacey asked if it was real.  *Id*.  The team leads Vivian Vega and Trey Wingfield acted swiftly, pulled Stacey to the side, and spoke with her.  *Id*.  Stacey never bothered Plaintiff again.  *Id*.  Plaintiff admits that none of the individuals who were responsible for hiring or promoting ever made these types of statements about her hair.  Dkt. 36-1 at 35.  She further admits that she did not report the hair comments or hair touching to any supervisor or HR other than Angela Peterson, the general manager, which occurred over a year later in November 2022.  Dkt. 36-1 at 13, 15; Dkt. 36-2.

## *Conditional approval for training in Airport Operations*

In December 2021, Peterson conditionally approved Plaintiff to train in airport operations to potentially fill the position of a base operations agent.  Dkt. 36-1 at 35, 36; Dkt. 36-13 at 7; Dkt. 36-15 at 3.  The operations job required expertise in using the Excel program, which Plaintiff understood.  Dkt. 36-1 at 36.

4

Plaintiff took a "crash course" in Excel at college in 2016.  Dkt. 36-1 at 38.  She admitted, although she told Peterson that she had used Excel in the past, she had difficulty during training in using the Excel program in operations.  Dkt. 36-1 at 36, 38.  Her supervisors in ground operations, as well as co-worker John Jordan, told Peterson that Plaintiff was not grasping the duties of the position.  Dkt. 36-15 at 3.  According to Peterson, Plaintiff "struggled with Excel" and the two of them reached the conclusion that Plaintiff would be better off resuming her tasks as a customer service agent. Dkt. 36-13 at 7.

Plaintiff vehemently denies that she amicably agreed to return to her prior position.  According to Plaintiff, the two supervisors in ground operations, Melissa Simmons and Marc Small, "were constantly saying that I needed to go back to [the customer service agent]" role.  Dkt. 36-1 at 39.  The two started to harass her because they did not want her in ground operations.  *Id*. at 91.  They harassed her "by excessively . . . micromanaging" her when they did not act this way toward others.  *Id*.  Plaintiff claims that "they were excessively mean" and Simmons spoke to her in a "disgusting" or "sarcastic" tone.  *Id*. at 91–92.  Plaintiff told Jordan about Simmons and Small but never alerted anyone else or used the company reporting procedure to lodge her complaints.  *Id*. at 92–93.

Plaintiff believes that not receiving full approval for a transfer to airport operations was racial discrimination because in comparison to other employees,

she did not receive the same training.  Dkt. 36-1 at 39.  Specifically, she mentioned Jaquana ("Jay") Cunningham (African American) and "Amari" ("brown-skinned") as individuals who received better training in operations.  *Id*. at 39, 40.  It was Cunningham who was selected as the base operations agent in airport operations. Dkt. 36-1 at 40; Dkt. 36-15 at 3.

*More job applications*

Despite her ineligibility arising from the attendance warning, Plaintiff continued to apply for promotions.  On December 30, 2021, Plaintiff applied for a lead customer service agent position.  Dkt. 36-1 at 40, 41.  Allegiant canceled this job requisition before it was filled.  Dkt. 36-14 at 4.  On January 20 and April 30, 2022, Plaintiff applied again for a customer service agent lead position.  Dkt. 36-14 at 4; Dkt. 36-1 at 40, 41.  Allegiant used the January requisition to promote four new internal leads: Trey Wingfield (Caucasian), Curtis Edwards (Caucasian), Alaysha Dixon (African American), and Jeremy Lee (Hispanic).  Dkt. 36-14 at 4: Dkt. 36-1 at 41, 93.  On April 30, 2022, Plaintiff also sought a stations supervisor job, but Ray Smith (Hispanic) was internally promoted to this position. Dkt. 36-14 at 4–5.  Allegiant did not promote Plaintiff for these positions because she remained on an active Level 2 warning for attendance.  Dkt. 36-14 at 3, 5.

Meanwhile, Plaintiff received a second counseling in early March 2022 for attendance—calling out for shifts.  Dkt. 36-6 (Corrective Counseling Form of 3/4/2022); Dkt. 36-1 at 43.  This "Coaching Discussion" is not considered disciplinary action.  Dkt. 36-1 at 43.  Even though Plaintiff still carried the July 2021 attendance warning, Peterson approved her application for a full-time customer service agent position on April 1.  Dkt. 36-1 at 43; Dkt. 36-14 at 4.  An increase in hours is not considered a promotion.  Dkt. 36-14 at 4.

At last, on July 12, 2022, Plaintiff's Level 2 warning expired.  On July 17, she applied for a non-supervisory, hourly, part-time position as a charter ramp representative.  Dkt. 36-14 at 5.  Allegiant offered this position to Plaintiff, but she did not timely accept.  Dkt. 36-1 at 44, 45.  On July 31, Plaintiff applied for another part-time position—a grounds operations agent commissary lead, which opening was closed without a hire or promotion.  Dkt. 36-14 at 5; Dkt. 36-1 at 45.  Plaintiff's final application on August 12 for a position in Laredo, Texas, as a non-supervisory stations representative-customer care employee was denied.  Dkt. 36-14 at 5; Dkt. 36-1 at 45.  Plaintiff does not allege discrimination concerning any of these three positions.  Dkt. 36-1 at 44–46.

*Final Warning for Attendance*

In November 2022, she received another disciplinary action for both attendance and tardiness.  Dkt. 36-7 ("Corrective Counseling Form of 11/21/2022). This third action was a "Final Warning" issued "due to call outs and recent lates for [Plaintiff's] shifts" and cautioned that "any further occurrences may result in termination from the company." *Id*.  The attachment to the warning shows the last infraction prompting the action occurred on November 17, 2022.  *Id*. at 3.  Plaintiff and Peterson met on November 22, to discuss this final warning.  Dkt. 36-15 at 4. Plaintiff refused to sign the form.  Dkt. 36-7 at 2.

At the meeting with Plaintiff about attendance, Peterson asked Plaintiff if she had heard any rumors about racial tensions or a "race war" at work.  Dkt. 36-15 at 4; Dkt. 36-1 at 15, 18.  Plaintiff, for the first time, told Peterson about co-worker Stacey touching her hair in the past but that the two leads (Vega and Wingfield) addressed the situation immediately.  Dkt. 36-1 at 13, 16–17.  Plaintiff did not mention any other employees specifically but told Peterson that "a majority of the workers" were touching or commenting on her hair.  Dkt. 36-1 at 13, 16. Plaintiff told her she was unaware of any race war.  Dkt. 36-1 at 18; Dkt. 36-15 at 4.

*Incident with co-worker Buch and ensuing Investigation*

On the night of November 20, 2022, an incident occurred between Plaintiff and Jennelle Buch, a ground operations agent, in the Allegiant breakroom.  Dkt. 36-1 at 52; Dkt. 36-11 at 6; Dkt. 36-14 at 6; 29–30.  Around 9:30 p.m., Buch was on a company computer working on required learning paths called "Universities," when Plaintiff walked in and asked her to get off the computer so that she could enter "gate notes" or flight information and also to print something.  *Id*.  Plaintiff kept insisting that she needed the computer Buch was using because Plaintiff, perhaps mistakenly, believed that it was the closest computer with printing capabilities.  Dkt. 36-11 at 6–7.  Buch, on the other hand, understood that the computer she was using was designated for ground operations agents, like herself, to complete their mandatory courses and that customer service agents, like Plaintiff, have many more available computers.  Buch declined to get up from the computer but was feeling bullied.  *Id*.; Dkt. 36-14 at 29.

After Buch repeatedly responded to Plaintiff's requests by telling Plaintiff to find another computer, Plaintiff responded with either "This is racist!" or "Is this racist?"  Dkt. 36-11 at 6; Dkt. 36-14 at 6; Dkt. 36-14 at 29, 30.  At that point, Buch logged off the computer and spoke with her team lead, Reinaldo Berrios.  Dkt. 36-11 at 6–7.  Berrios had witnessed the incident and after Buch asked to go home, he told her she could, provided she had completed her work.  Dkt. 36-11 at 6; Dkt. 36-1 at 63, 70.  Others who witnessed the incident were Carlos Huertas (ground

operations agent), and Kalista Stone (ground operations agent).  Dkt. 36-11 at 7; Dkt. 36-14 at 7, 30.

Buch also reported the incident to Peterson.  Dkt. 36-11 at 6–7.  Peterson set up a meeting about seven days later, on November 28, to discuss the matter with Buch and Valentina Zacco (HR specialist).  *Id*. at 8.  At the meeting held November 28, Buch relayed the events of November 20.  Dkt. 36-14 at 30.  Buch remembered that long before the November 20 occurrence, she and Plaintiff had discussed race.  Dkt. 36-11 at 5.  For example, with Buch present, Plaintiff told other African Americans "not [to] act so white skinned," which Buch found offensive because Plaintiff had previously told her that Buch's ancestors were slave-owners when they were not.  Dkt. 36-11 at 5; Dkt.36-14 at 7; Dkt. 36-14 at 30.  As requested, Buch submitted a written statement concerning the breakroom incident.  Dkt. 36-14 at 29 (email dated 11/28/2022).

At this juncture, Anna Mortimer (HR specialist III) took over as lead investigator of Buch's complaint.  Dkt. 36-14 at 2, 5, 7.  On December 12, Mortimer and Phillip Marran (a PIE supervisor) interviewed Plaintiff concerning the breakroom incident.  Dkt. 36-1 at 62; Dkt. 36-14 at 8, 27; Dkt. 41-11 at 5.  Plaintiff denied stating "This is racist" or using the word "racist" and told them racism did not come up that night.  Dkt. 41-11 at 5.  Plaintiff said she had heard the "buzz lately about racial tensions" at Allegiant but it did not involve her.  *Id*.; Dkt.

10

36-1 at 66.  Although not mentioned in Mortimer's contemporaneous notes, Plaintiff testified at deposition that in the discussion of December 12, Plaintiff accused Buch of previously making racist comments and being a racist.  Dkt. 36-1 at 62.

In any event, Plaintiff submitted her written statement on December 15, which disclosed instances of alleged past exchanges between Plaintiff and Buch, and perhaps also Buch's sister, Samantha Buch, who works for Allegiant as a customer service agent and Buch's brother, who used to work for Allegiant.  Dkt. 36-8 at 4–5.  Plaintiff recounted the night of November 20, and wrote that Buch "was being a bully" and "very mean," became angry, logged off the computer, and "stormed out" of the breakroom.  *Id*. at 4.  For the first time, Plaintiff alleged that Buch previously made "the most disrespectful comments about all races . . . [m]ainly the Hispanic race."  *Id*. at 5.  She continued that Buch once said that George Washington is the "only white person with that last name . . . because he was a slave owner."  *Id*.  Plaintiff wrote that when she had parked her car in front of the airport, she left her hip hop music on "low," and Buch turned it off "because it was too ghetto and trashy."[5]  *Id*.  When Buch and Buch's brother changed

---

[5] Buch testified that she recalled Plaintiff moving her car from the parking lot and leaving it out front, running with the "music blaring."  Dkt. 36-11 at 6.  Because it was bothering the customers, Buch reached into Plaintiff's idling car and turned the music down.  *Id*.

Plaintiff's car's light bulb, they told Plaintiff they got sick afterwards because "they were hugged by a black person for the first time." *Id*. Lastly, she said that a former ground operations agent told her he overheard either Buch, her sister, or another co-worker say "getting this 'n***** b****' fired." [6] *Id*.

Plaintiff admits that she never reported any of these incidents before. Dkt. 36-1 at 56–58, 67. She testified that she did not report these incidents because Buch was making jokes, even though Plaintiff did not think they were funny. *Id*. Furthermore, when Mortimer asked Plaintiff to provide the dates and witnesses to her newly raised allegations in her written statement, Plaintiff could not do so. Dkt. 36-8 at 1 ("I wish I did but unfortunately do not. All interactions have been 1 on 1 [with Buch].").

*Witnesses' Testimony*

Two co-workers who witnessed the breakroom incident were also interviewed on December 12—team lead Berrios and Huertas.

Berrios told Mortimer and Marran that Berrios witnessed the entire breakroom incident and that it was Plaintiff who brought up the race issue, telling Buch that the reason Buch would not let Plaintiff use the computer was because

---

[6] No other context is provided for this allegation.

Buch was white and Plaintiff was black.  Dkt. 36-14 at 23.  As soon as Buch heard the comment, she logged off the computer, asked to speak with Berrios, and he gave her permission to clock out early.  *Id*.  Berrios confirmed that Buch made no reference to race.  *Id*.  In his written statement submitted the next day, Berrios wrote that Plaintiff repeatedly asked Buch to get off the computer because she needed to use it.  Dkt. 36-14 at 22.  Plaintiff ultimately told Buch that "this is racist" that Buch would not turn the computer over to Plaintiff.  *Id*.  Berrios added that Plaintiff's behavior was "inappropriate and not necessary."  *Id*.

Huertas told Mortimer and Szilvia Nemeth (a PIE supervisor) that he observed part of the incident while he was having his dinner in the breakroom. Dkt. 41-11 at 6.  Huertas told them that Buch was doing her Universities on the computer but Plaintiff kept asking her to use that computer.  *Id*.  Plaintiff said something racial, that it was not fair.  *Id*.  In his written statement submitted that day, Huertas wrote that Plaintiff " was persistent on trying" to get Buch off the computer, but Buch remained calm and continued to finish her work.  Dkt. 36-14 at 24.  He recalled that it was Plaintiff who made a racial comment to Buch, which was otherwise irrelevant to their discussion.  *Id*.

A third eyewitness, Stone, was interviewed on December 19.  Dkt. 41-9 at 3. Stone told Mortimer and Nemeth that when Buch told Plaintiff there were other computers to use, it was Plaintiff who brought up race, saying "Is this because I am

black?" Dkt. 36-14 at 18.  Stone confirmed that Buch said nothing that could be perceived as invoking race but acknowledged that Plaintiff often brought up the race card—that Plaintiff was black, and Buch and Stone were white, which always got under Buch's skin.  *Id*.  In her written statement submitted December 21, Stone wrote that Plaintiff said to Buch: "But this is the only computer that will let me print what I need printed. Is it because of race?"  Dkt. 36-14 at 15.

### *Suspension and Termination*

On December 19, Mortimer and Nemeth interviewed Plaintiff again.  Dkt. 41-9 at 2.  Plaintiff stressed that in the breakroom that night, she and Buch did not speak about racism, and Plaintiff did not make a comment about Plaintiff being black as the reason Buch would not leave the computer.  Dkt. 41-9 at 2.  Mortimer told her that she was concerned about Plaintiff alluding to other employees as being racist.  *Id*.  She told Plaintiff that at least three witnesses who were in the breakroom that night had corroborated Buch's allegation that Plaintiff commented on racism as the reason Buch would not give up the computer.  *Id*.  Mortimer told Plaintiff that she was suspended pending further investigation.  *Id*.

On December 19, Plaintiff sent to the Chairman of the Board and Executive Director of Allegiant, Maury Gallagher, an email, which provides in pertinent part:

> I have been wanting to contact you for a while about the ongoing racial tensions here at Allegiant . . .  it's out of control how situations are

handled here.  I've been dealing with racism and all the stereotypes that
go with it since I've started [at PIE].  Anytime I mentioned it, it was
swept under the rug as me overreacting.  I recently addressed a co-
worker about their racist comments and then I was placed on suspension
pending investigation. . . .

Dkt. 36-14 at 17.  Afterwards, on December 20, Mortimer wrote her supervisor,

Adriana Ramirez, stating:

[Plaintiff] denied saying anything [in both investigative meetings and
her written statement] relating to racism to the employee in the situation
because there was nothing racist that occurred.  In her email [to
Gallagher] she states "she addressed her coworker about racist
comments."  There is a dishonesty issue with this employee.

Dkt. 36-14 at 16 (email dated 12/20/2022).

On December 22, Mortimer, Peterson, and Brock Gregory (PIE manager)

held a discussion with Buch about the additional, past events raised by Plaintiff in

her December 16 written statement.  Dkt. 41-6 at 4–5.  Buch submitted a second

statement addressing these incidents.  *Id*. at 2–3.  That same day, Mortimer and

Peterson held a meeting with Plaintiff about the additional issues she raised in her

written statement and the email to Gallagher.  Dkt. 41-7 at 3–4.  Mortimer confirms

that Plaintiff reiterated that she had no witnesses to Buch's alleged past racial

comments and could not provide specific examples of "racism" in the workplace

and that she did not say anything about race during the breakroom incident.  Dkt.

36-14 at 13.  Plaintiff did not identify any complaints that were "swept under the

15

rug" by Allegiant's management.  *Id*.  They told Plaintiff she would remain on suspension pending further investigation.  Dkt. 41-7 at 4.

Several days later, on December 27, Allegiant determined that Plaintiff should be terminated for misconduct, specifically dishonesty during the course of the investigation about what transpired on November 20.  Dkt. 41-2 at 25; Dkt. 41-5 at 2.  Plaintiff maintains that she was honest.  Dkt. 41-2 at 25.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  It is not enough for the non-moving party to posit that "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citing *Anderson*, 477 U.S. at 256).  The non-moving party must present "affirmative evidence that would allow a reasonable jury to rule for [her]."  *Id*. (internal quotation marks omitted).

The court must not weigh conflicting evidence or make credibility determinations but must draw all reasonable inferences from the evidence in favor

of the nonmoving party. *United States ex rel. Bibby v. Mortg. Inv. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021) (citations omitted). An inference is reasonable if it is not based on pure conjecture and speculation. *Hinson*, 927 F.3d at 1115 (citation omitted); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (citations omitted).

If a party attempts to create an issue of fact through an affidavit, that affidavit "may be disregarded if it 'flatly contradict[s]' earlier deposition testimony without explanation." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). Drawing all reasonable inferences in favor of the nonmoving party, the Court must not determine the witness's credibility nor weigh the evidence in reviewing the two. *Id.*; *Feliciano v. City of Miami Bch.*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

## I. Race Discrimination under 42 U.S.C. § 1981

Section 1981 prohibits employers from discriminating against employees on the basis of race in private or public employment contracts. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999)). "Unlike a Title VII discrimination claim—where a lesser

17

'motivating factor' standard sometimes applies—a § 1981 claim requires proof that race was a but-for cause of [the] termination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1013, 1017 (2020)).  The "but-for" test does not require Plaintiff to prove that race was the "*exclusive* cause" of her termination. *Ossmann*, 82 F.4th at 1014 (emphasis in original).  Nonetheless, Plaintiff must show that "a reasonable jury could conclude that had [she] not been [black], [she] would not have been terminated." *Id*.

### *A.      Failure to promote or transfer*

To prove a *prima facie* case of racial discrimination based on the failure to promote, Plaintiff must establish that (1) she was a member of a protected class, (2) she was qualified for and applied for the job, (3) she was rejected, and (4) someone outside her protected class was promoted. *Anthony v. Georgia*, 69 F.4th 796, 807 (11th Cir. 2023) (citation omitted).  In her response, Plaintiff did not address Allegiant's arguments for summary judgment on any alleged discriminatory failures to transfer or promote. *See generally* Dkt. 40.  To the extent Plaintiff's "disputed facts" contains argument, the Court considers the issues raised therein. Dkt. 41 at 1–5.

First, there is no direct or circumstantial evidence that Plaintiff was discriminated against when she was not transferred to airport operations after she started training there in December 2021.  Absent waiver or exceptional circumstances, Allegiant's policy states that an employee does not become eligible for a promotion until after working six months provided that the employee does not have an active "Level 2" or higher warning.  This type of warning makes an employee ineligible for a promotion or transfer for one year.  Having received such a warning July 12, 2021, Plaintiff was ineligible for a promotion or transfer until July 12, 2022—unless her situation was deemed "extraordinary or unique."  Dkt. 41 at 3; Dkt. 36-1 at 32, 34; Dkt. 36-3 at 31.  Notably, she has not shown that anyone else was an exception to this rule, let alone a non-black person.

According to Plaintiff, Peterson told her that she could train and move to airport operations.[7]  Dkt. 41 at 3; Dkt. 36-1 at 32, 34.  Peterson states that the approval was conditional in view of Plaintiff's disqualifying attendance warning.  Dkt. 36-15 at 3.  Peterson eventually told Plaintiff that she needed to return to her position as a customer service agent because she could not adequately use Excel, a necessary skill for a base operations agent position.  Dkt. 36-15 at 2.  According to Peterson, Jordan told her that Plaintiff did not sufficiently understand how to use

---

[7] It is uncontested that a move to an operations agent position would be considered a transfer (not a promotion) with no pay raise.  Dkt. 36-1 at 35.

Excel in the duties of operations department employees.  *Id*. at 3.  Peterson testified

that she discussed with Plaintiff about her struggling with Excel.  Dkt. 36-13 at 7.

Although Plaintiff acknowledges that she had some difficulty with Excel, she

blames it on inadequate training in operations.  The subject base operations agent

position was filled by Cunningham, an African American female.  Dkt. 36-15 at 3.

Second, the lead positions Plaintiff sought throughout 2021 and into 2022

were either unattainable based on a disqualifying event[8] or closed and no one was

promoted.[9]  In addition, after Plaintiff was no longer disqualified, she failed to

timely accept an offer for a part-time job.[10]  Lastly, she was not offered the position

of stations representative-customer care in Texas (not PIE), for which she applied

in August 2022, but she does not claim that this was due to racism.  Dkt. 36-1 at

44–46.

On this record, Plaintiff has failed to establish a *prima facie* case of race

discrimination for a failure to promote.  She was not qualified for a promotion per

the company's handbook until she had worked there for six months and her

personnel action was free of any Level 2 or higher warnings for one year.  When

---

[8] She applied on June 6, 2021, October 24, 2021, December 30, 2021, January 20, 2022, and April 30, 2022, for customer service agent lead or ground operations agent lead. Also on April 30, 2022, she applied for station supervisor.

[9] For the lead positions she sought on June 6, 2021, October 24, 2021, and December 30, 2021, the positions were closed. Even though she was no longer disqualified when she applied for the July 31, 2022, grounds operations agent commissary lead position, Allegiant removed this job opening before it was filled.

[10] She applied for and was offered, on July 17, 2022, the position of charter ramp representative.

she reached the six-month mark in August 2021, she was still disqualified due to her attendance warning of July 12, 2021.  When she became eligible for a promotion one year later, on July 12, 2022, she did not timely accept the offer of the charter ramp position, and the lead agent commissary position was closed.  If she were qualified for the agent position in airport operations back in December 2021, one must assume both the absence of disqualifying warnings and sufficiency in Excel.  Moreover, this position was filled by an African American female. Summary judgment is granted on failure to promote.

### B.    *Discriminatory Termination*

To establish a *prima facie* case of intentional race discrimination based on circumstantial evidence, the plaintiff must show that (1) she was a member of a protected class, (2) she was qualified for the job, (3) she suffered adverse employment action, and (4) she was treated less favorably that similarly situated employees outside her protected class.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*) (*Lewis I*).  The burden then shifts to the employer to rebut the presumption of intentional discrimination by articulating its legitimate, nondiscriminatory reason for her termination.  *Lewis I*, 918 F.3d at 1221.  If the

defendant meets this "exceedingly light" burden of production, the plaintiff must show the employer's reason is pretextual.

Even if the plaintiff cannot satisfy the *McDonnell Douglas* evidentiary framework, summary judgment will be denied if the plaintiff presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer discrimination."  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (citation omitted).  Under the "convincing mosaic" analysis, the plaintiff must highlight evidence of "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (citing *Lewis II*, 934 F.3d at 1185) (internal quotation marks omitted).  The overarching issue remains whether the true reason the plaintiff was fired was the discriminatory reason of race.  *See Tynes v. Fla. Dep't of Juvenile Justice*, 88 F.4th 939, 946–47 (11th Cir. 2023) (citing *Jenkins*, 26 F.4th at 1250).

### 1. *McDonnell Douglas* framework

Under the *McDonnell Douglas* framework, Plaintiff easily meets two of the four elements: she is a black African American, and Allegiant fired her.  She was qualified in the sense that she held the position of a full-time customer service

agent most of her time at Allegiant, up through her discharge.  However, Plaintiff was no longer qualified for the job if she stopped following Allegiant's attendance policies as well as demonstrating truthfulness and openness during the investigation.  *Cf. Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520–21 (11th Cir. 1990) (per curiam) (holding that plaintiff was no longer qualified where she failed to meet the employer's policy regarding performance despite ample and fair opportunity to do so).

Relying on the last element, Plaintiff argues that she was treated less favorably than similarly situated employees in the conduct of the investigation.  A similarly situated individual must have been "engaged in the same basic conduct (or misconduct) as the plaintiff, . . .subject[ed] to the same employment policy, guideline, or rule . . . [reported to the] same supervisor as the plaintiff, . . . [and] share[d] the plaintiff's employment or disciplinary history." *Anthony*, 69 F.4th at 805 (quoting *Lewis I*, 918 F.3d at 1227–28).  The plaintiff and comparators must be sufficiently similar in an objective sense.  *Id*. (citing *Lewis I*, 918 F.3d at 1228).

Here, Plaintiff must identify a similarly situated non-African American customer service agent who was not terminated when he or she 1) used a racist term, or accused a co-worker of racist intentions, and 2) was found dishonest. The only white co-worker referenced by Plaintiff who made a racist comment to a black co-worker was terminated, just like Plaintiff.  Dkt. 36-1 at 80.  There is no

evidence about any potential comparator who invoked racism and was found dishonest and not terminated.  Although Plaintiff suggests that Buch was the one who was dishonest in the interview, there is no evidence to support this and Defendant reasonably found it not to be true after conducting an extensive investigation.  Nor does Plaintiff present any evidence that Defendant's investigation was unreasonable in light of the contradictory stories told by the other co-workers.

Nonetheless, Plaintiff asserts two possible comparators: Buch and her sister. Dkt. 40 at 4–6.  All three were customer service agents at the same time of the incident.  Plaintiff argues that Allegiant should have investigated the claims of racially discriminatory conduct raised in her first interview and written statement before she was suspended.  Buch is a comparator in that she allegedly raised or initiated racial or racist terms with Plaintiff in the past, but Buch was not suspended or terminated.  Plaintiff also contends that when a prior complaint had been made to Allegiant about an employee using the "n" word at a bar in the summer of 2022 (with Buch's sister present), it was dismissed by Peterson.  Dkt. 36-1 at 57; Dkt. 41-4 at 2 (Pl. Decl. in opposition).  Plaintiff admits she has no firsthand knowledge of this event whatsoever.  Dkt. 36-1 at 58.

These arguments do not persuade the Court that Buch or her sister were similarly situated in all material respects, neither having been found dishonest after

24

an extensive investigation which ultimately resulted in their own admissions of dishonesty to Defendant's CEO.  Because the absence of comparators does not necessarily doom Plaintiff's claim for discrimination, the question of whether the evidence, considered as a whole, might infer intentional discrimination will be analyzed using the "convincing mosaic" standard.

## 2. Convincing mosaic standard

### a.  Suspicious timing, Ambiguous statements, and other Information

Plaintiff contends that the timing was suspicious when Mortimer concluded Plaintiff was dishonest immediately after Plaintiff reported racial discrimination at Allegiant to now CEO Gallagher (on December 20) but before Plaintiff's complaints of past conduct were investigated.  Plaintiff posits that the words attributable to Plaintiff constitute no more than ambiguous statements because there is no clear consensus on exactly what Plaintiff said in the breakroom on November 20.  As "other information," Plaintiff argues Allegiant failed to properly investigate the "race war " and the past constant touching of Plaintiff's hair by co-workers.  Additionally, Plaintiff asserts that Mortimer incorrectly and illogically concluded that Plaintiff was dishonest by informing Gallagher of racial discrimination at PIE.

In the Court's view, Plaintiff has not shown that the timing, statements, and other points raise genuine issues of material fact that race could be inferred as the true reason for her suspension and termination.  Mortimer conducted both interviews of Plaintiff as well as the witnesses who were in the breakroom on November 20.  She reviewed all the witness statements.  Three witnesses corroborated Buch's version of the events.  Upon her reading the email sent to Gallagher, Mortimer's initial assessment appears reasonable—after maintaining she said nothing relating to racism to Buch, Plaintiff contradicted herself and wrote that she did address Buch about racist comments.  *See* Dkt. 36-14 at 16.  Not mentioning anything about race yet addressing racist comments with her co-worker are incompatible statements.

Given that Mortimer held two meetings with Plaintiff about the breakroom incident and that Plaintiff stood by her denial of bringing up race or saying anything that could be construed as racist, Plaintiff was terminated for the non-discriminatory reason of lying during the investigation.  *See Perry v. Walmart, Inc.*, No. 2:18-cv-606-FtM-29NPM, 2020 WL 1158719, at *6–7 (M.D. Fla. Mar. 10, 2020) (granting summary judgment and finding Perry's dishonesty in an investigation about Perry's use of profanity towards a co-worker was legitimate, non-discriminatory reason for termination).  The Court also finds nothing suspicious about the timing of her termination, which occurred several days after

26

her dishonesty was discovered and with the benefit of additional interviews of Buch and Plaintiff, as well as Buch's second written statement.  Moreover, Plaintiff provided them no witnesses to Plaintiff's new complaint about the past touching of Plaintiff's hair and the past complaints about Buch and an alleged incident at a bar that Plaintiff learned from an unidentified purported witness.[11]

### b. Systematic better treatment of similarly situated employees

Plaintiff argues that she was treated differently than Buch in the investigation of Buch's complaint because Plaintiff was not believed and her statements about Buch and others were not considered or taken seriously. Although Allegiant ultimately believed Buch and the three eyewitnesses, Plaintiff presents no evidence of systematically better treatment of non-black customer service agents by Allegiant crediting their facts over hers.

### c. Pretext

Allegiant's proffered reason for suspension and termination was Plaintiff's dishonesty in the investigation of Buch's complaint.  To demonstrate pretext, a plaintiff must show that the reason was ill-founded or false and that the real reason

---

[11] Although Plaintiff attempts to provide some names in her declaration filed in opposition to this summary judgment, it is uncontested that Plaintiff told Mortimer that any racial comments made by Buch were witnessed only by Plaintiff.

was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S., 515 (1993); *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2012) (citation omitted).  It is not enough for the plaintiff to simply argue that the reason was not true or that she did not believe her conduct amounted to dishonesty.[12]  It is also insufficient that the plaintiff subjectively believed that she was discriminated against.  *See Boone v. Publix Super Markets, Inc.*, No. 8:18-cv-2523-T-60TGW, 2020 WL 1694163, at *5 (M.D. Fla. Apr. 7, 2020) (citing *Perry*, 2020 WL 1158719, at *8).

The issue here is whether Allegiant honestly believed Plaintiff's conduct amounted to dishonesty.  Allegiant is entitled to rely on a good faith belief that Plaintiff committed the misconduct of lying during an investigation, and even if Allegiant were proved to be mistaken, this mistake does not show pretext.  *See Davidson v. Chspsc LLC*, 861 F. App'x 306, 311 (11th Cir. 2021) (unpublished) (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) and *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000)).  The

---

[12] In *Phillips v. Legacy Cabinets*, the Eleventh Circuit concluded the district court did not err on the issue of pretext because the proffered reason might have been false if a jury chose to believe the plaintiff that the conduct comprising insubordination itself never happened.  87 F.4th 1313, 1324 (11th Cir. 2023) ("Phillips could not prevail, then, by arguing that she did not believe her actions to be insubordinate or that she should not have been fired for her insubordinate conduct—but that is not what she says.  Instead, Phillips insists that the conduct itself never happened.").  Unlike *Phillips*, while Plaintiff maintains she did not say anything about race during the breakroom incident, she seemingly took the contrary position in the email to Gallaher—she had recently addressed a co-worker about their racist comments.  The facts here are distinguishable from those in *Phillips*.

28

relevant inquiry is limited to whether Allegiant believed Plaintiff was guilty of dishonesty, not whether the other witnesses were "lying through their teeth."  *See*, *e.g.*, *Whitehurst v. Liquid Env't Sols, Inc.*, 45 F. Supp. 3d 1328, 1348–49 (M.D. Fla. 2014) (citation omitted).

Plaintiff claims she was telling the truth that she did not mention race or make a racial comment in the breakroom.  This assertion, however, is undermined by Plaintiff's written statements and her own email to Gallagher.  In the email, Plaintiff seemingly contradicts her prior statements that she never brought up race. Even if a jury found Mortimer somehow misunderstood Plaintiff's email to Gallagher, Plaintiff's written submissions provide a reasonable basis for Allegiant to honestly believe Plaintiff was not telling the truth during the investigation. Allegiant honestly characterized Plaintiff's multiple versions of the breakroom incident as dishonest.

Plaintiff further argues pretext based on "inconsistency among witnesses about what was said, and who was present, that was never interrogated by Allegiant" and on Buch being unsure of what Plaintiff said to her.  Dkt. 40 at 11. To the contrary, Plaintiff could not identify anyone else who witnessed the breakroom incident, and Buch and the other witnesses were confident that Plaintiff asked if Buch was not logging off the computer because of race.

Plaintiff's displeasure with past conduct concerning employees touching her hair does not raise an inference of discriminatory pretext.  First, Plaintiff did not contemporaneously bring this issue to the attention of any lead, management, or HR.[13]  Her references to discussions with Jordan about her hair are unspecific, other than she talked with him in the past.  See Dkt. 40 at 14; Dkt. 36-1 at 77–78.  Second, the only time Plaintiff objected to unwanted touching and commenting by a co-worker, was the incident with Stacey which was immediately taken care of by Vega, Wingfield, and Peterson.  Even after Plaintiff wrote the email to Gallagher and Mortimer questioned Plaintiff about it, Mortimer wrote: [Plaintiff's] narrative vacillated and she did not provide much detail regarding her allegations of racism in PIE, other than her concerns that co-workers had touched her hair and that was addressed and has since stopped."  Dkt. 41-5 at 2.

With respect to the alleged incident at the bar outside of work, Plaintiff's declaration in opposition, for the first time, identifies Dixon as the employee who told Plaintiff that another co-worker overheard Buch's sister use the "n" word. Dkt. 41-4 at 2.  This testimony differs from Plaintiff's deposition testimony that Buch's sister and Buch would often hang out with the co-worker who used the term.  Dkt. 36-1 at 58.  In any event, Plaintiff admits that she "[does not] know what really happened" because she was not there.  Dkt. 36-1 at 18, 58.

---

[13] Plaintiff did not bring a claim for hostile work environment, nor does she argue one now.

30

As to the outside incident where someone overheard the phrase "n*****b**** fired," very little context is given, other than Plaintiff thought the person fired might refer to herself.  Dkt. 40 at 14.  Again, Plaintiff admits that she was not there when it happened, and the alleged discussion about the event occurred "way before" she was investigated.  Dkt. 36-1 at 77–78.

Overall, Plaintiff did not report any of these incidents to management prior to the investigation of the incident with Buch.  When Peterson met with Plaintiff in November concerning her final warning for attendance, Peterson asked her about rumors of a "race war" and racial tensions.  Although she brought up the hair-touching incident, Plaintiff denied she knew of any tensions and failed to inform Peterson of any of the incidents she later raised in her December 15 statement.  Throughout the investigation of the breakroom incident, including Plaintiff's interview with Mortimer concerning her December 15 statement, Plaintiff maintained she knew no witnesses other than Buch, and all their interactions were one on one.  Dkt. 36-8 at 1.  Based on this record, Plaintiff has failed to show evidence that Allegiant's reason for termination was permeated by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," such that a reasonable factfinder could find it "unworthy of credence."  *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (citations omitted).

## II.  Retaliation under § 1981

To prove a claim of retaliation under § 1981, an employee must show: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012) (internal quotation marks omitted).  Although § 1981 requires discrimination based on race, "Plaintiff is not required to show that the claimed retaliation be 'directly due' to Plaintiff's race." *Johnson v. Family Practice & Injury Ctr., Inc.*, 437 F. Supp. 3d 1108, 1120 (M.D. Fla. 2020) (citing *Tucker v. Talladega City Sch.*, 171 F. App'x 289, 295–96 (11th Cir. 2006) (per curiam)).  A failure to satisfy any of the three elements renders summary judgment appropriate. *Id*. (citation omitted).

Plaintiff claims she was retaliated against because of the past complaints she raised about Buch during the investigation.  Dkt. 36-1 at 93.  Plaintiff believes she was terminated in retaliation for both making these complaints and writing to Gallagher, who is now the CEO.  *Id*.

To the extent any of the complaints occurred before December 2022, Plaintiff fails to establish a causal connection between past protected activity and her termination.  Not only is such past conduct too remote in time, but the causal

chain connecting past alleged protected activity and her termination was broken.

Both the breakroom incident leading to the investigation in November and

December 2022, and the discovery of Plaintiff's misconduct of dishonesty,

constitute superseding, intervening acts.  *See*, *e.g.*, *Berry v. Crestwood Healthcare*

*LP*, 84 F.4th 1300, 1312 (11th Cir. 2023) (affirming summary judgment on

retaliation—"intervening discovery of misconduct fatally undermines the probative

value of temporal proximity between her protected activity and her termination");

*Whatley v. Metro. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1329 (5th Cir.

1980).  As in *Berry*, the email from Mortimer about Plaintiff's dishonesty does not

suggest that Allegiant terminated Plaintiff "*because* she called corporate" (here,

Gallagher).  *See Berry*, 84 F.4th at 1309.  Rather, when Mortimer read Plaintiff's

email to Gallagher, she discovered that Plaintiff had withheld the truth during the

investigation of the breakroom incident.

In the email, Plaintiff stated that she was suspended when she "recently

addressed a co-worker about their racist comments."  At the meeting after she sent

the email to Gallagher, she explained that when she wrote "addressed a co-

worker," she was referring to her confrontation of Buch two months prior to the

breakroom incident.  Dkt. 41-5 at 2.  As Plaintiff had already told Mortimer, she

could not name any witnesses to the past racial comments made by Buch.  Nor

could Plaintiff provide any details of the incident two months before she was

suspended.  Plaintiff maintained that nothing was said about race during the breakroom incident.

Also in the email to Gallagher, Plaintiff referenced that racism and stereotyping were "swept under the rug."  In the interview with Mortimer that followed, Plaintiff could not think of any specific examples of racism that had been "swept under the rug" other than the past hair touching.  Yet Plaintiff did not report any touching other than the one incident with Stacey, which was long before the breakroom incident.  Plaintiff's two leads handled the situation, and Stacey never bothered Plaintiff again.

Plaintiff has failed to prove that Allegiant's desire to retaliate was the "but-for" cause of her suspension and termination.  *Univ. of Tex. Sw. Med Ctr. v. Nassar,* 570 U.S. 338, 352, 360 (2013).  The Court concludes that there are no genuine disputes of material fact precluding summary judgment on retaliation.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment (Dkt. 33) is **GRANTED**.  The Clerk is directed to enter final summary judgment in favor of Defendant and against Plaintiff, terminate any pending deadlines and motions, and close this case.

**DONE AND ORDERED** at Tampa, Florida, on June 1, 2024.

34

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**<u>COPIES FURNISHED TO</u>**:
Counsel of record